IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JOHN HALL et al.,

            Plaintiffs,

v.                                            CIVIL ACTION NO. 3:07-0107

MARTIN ENGINEERING COMPANY,

            Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiffs filed this lawsuit alleging the Defendant duped them into selling their successful business for a minimal price and without prospects of future royalties purely for the purpose of removing them from the market. On September 12, 2007, the Court denied in large part Defendant's motion to dismiss (Doc. 23).[1] Now pending before the Court is Defendant's Motion for Summary Judgment (Doc. 86). For the reasons explained below the motion is **GRANTED in part** and **DENIED in part.** A factual dispute on the terms of an oral agreement remains.

**Standard of Review**

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[1] The Court dismissed Plaintiffs' claim for breach of the duty of good faith and fair dealing. As explained more fully below, Illinois law does not recognize an independent duty of good faith and fair dealing, although it will use a covenant of good faith and fair dealing as a construction aid to the interpretation of a contract. Order of September 12, 2007 at 8-10.

Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**Background**

John Hall is a West Virginia resident who has worked most of his life in the coal industry. From 1973 to 1995, Hall worked as a miner and supervisor for several companies both in and out of the state. In order to make a more permanent home in West Virginia, he took a job in 1995 as a sales representative selling products to both coal mines and coal-fired power plants. In 1997, John Hall and his wife, Billie, took advantage of John's past experience in both production and sales and formed a corporation, Industrial Specialty Products ("ISP"), to distribute Brelko brand belt cleaners. In 1999, John and Billie determined that ISP could no longer distribute Brelko products; fortunately, John had developed his own product line. In 2000, the couple began to market their own Orion Belt Cleaning System ("Orion") and turned ISP into a limited liability corporation to manufacture and assemble the Orion belt cleaners.

Many industries, such as coal mines and coal-fired power plants, use conveyor belts to transport material from one place to another. During transport, belts can become dirty from coal

dust or other residue. Belt cleaners scrape this residue from the belt, maintaining the belt's efficiency and extending its life. While there are various arrangements of belt cleaners, the most complete systems contain three components: a primary; a secondary; and a tertiary cleaner. The Orion product line includes models of all three types in addition to related products.

In its first year ISP had success with the Orion products, generating over $911,000 in sales. Sales slowed, however, in 2002 and 2003. Gross sales totaled $448,467 in 2002, and $518,656 in 2003. The Halls earned income of $132,000 from the operation of ISP in 2001, but they earned only $48,000 in 2002 and $32,000 in 2003. To make up for the decreased earnings, the Halls personally borrowed $102,000 from ISP between 2001 and 2003. The slowdown also affected ISP's business equity. In 2002 ISP had a negative equity of $198,189 and in 2003 it had negative equity of $186,049. Despite these numbers, the Halls remained optimistic about their business. In John Hall's opinion they were doing fine because their credit rating was still good and they never missed a meal. The Halls firmly believed that poor sales were due to a general slowdown in the economy following 9/11 and the Enron scandal. They anticipated a boom in the energy sector beginning in 2004 and with it renewed success for ISP.

In April 2004, John Hall encountered Dick Stahura Sr. on a sales call at American Electric Power Company's John Amos Power Plant. Mr. Stahura represented Stahura Conveyor Products ("SCP"), one of ISP's competitors and a distributor for Martin Engineering ("Martin"). According to John Hall, Mr. Stahura questioned Hall's strategy of marketing his own products. Mr. Stahura suggested that Hall approach Martin's President, Todd Swinderman, about distributing Orion products. Martin had a world-wide distribution network and far more marketing power than ISP.

John Hall set up a meeting with Todd Swinderman, and in June of 2004 loaded his pickup truck with three Orion products, the OR-1000, OR-2000, and H2O-4000 (a primary, secondary and tertiary cleaner, respectively).  He drove himself to  Martin's headquarters in Neponset, Illinois.  After viewing the products, Todd Swinderman took Hall on a tour of Martin's production facilities and back to his office.  According to Hall's recollection, Swinderman told him that "all of our belt cleaners . . . sell over a million a year annually. . . . From the looks of yours. . . I think we can do a whole lot better than that."  John Hall Dep. at 174 Pls'. Exh. 27.  Swinderman explained Martin's worldwide distribution network and told Hall that if Orion products were acquired by Martin they would be marketed internationally.  Finally, Swinderman told Hall that he preferred to keep any agreement a gentleman's agreement and assured Hall that he did not need his own attorney.  Swinderman explained that Martin's attorneys would handle the paperwork and Hall could simply sign the agreement so that "the lawyers don't make all the money." *Id*. at 175.

Following the meeting, Swinderman sent Hall a letter dated June 9, 2004.  The letter explained the information that Martin would need to evaluate ISP and Orion.  The requested information included financial statements from the past 3 years and projections for 2004, a percentage breakdown of sales by product, and copies of all patents and patent applications owned by ISP.  The letter explained that "[c]ommon sales revenue for a patented product in our market niche is $500,000 to $3,000,000."  June 9, 2004 Letter, Pls'. Exh 17.  It cautioned that "[r]oyalties on patents in our business have steadily decreased over the years as more competitors enter the market and the product lines mature." *Id.*  Finally, the letter explained two options to bring John Hall on board with Martin Engineering. The first was to serve as a full-time employee of Martin – under this approach Hall would earn a salary but no royalties. The second approach was as a

consultant – under this approach Hall would receive compensation for consulting services and a royalty on sales of products he developed.

Throughout 2004 and 2005 the Halls negotiated with Martin about the purchase of ISP and the exclusive license to Orion products. The Halls sent Martin the requested information – including a projection that ISP's sales of Orion products would total $1,288,559 in 2004. In October of 2004, Martin presented the Halls with the following proposal: 1) an up-front payment for ISP of $375,000 in cash; 2) purchase of ISP's inventory; 3) payment of six percent royalties on all of Orion products until patents on those products expired, 4) payment to John Hall of $50,000 a year for two years to serve as a consultant. The Halls did not hire a lawyer to help them with the deal, but did retain an accountant, William Lutz, to help them gather financial information and evaluate the offer. Lutz advised the Halls that any agreement should include the following term: "Martin will guarantee sales of $1 million per year and remit the annual guaranteed amount monthly with annual settlement 30 days after the end of each year." The Halls did not propose any such term in their negotiations with Martin.

At the end of 2004, ISP sales of Orion products were well below the Halls' projection, totaling only $769,756. Based on this sales performance, Martin decided that its initial proposal was too high. In a February 4, 2005 letter, Martin offered $200,000 cash up-front with an additional $175,000 payment contingent on Orion products reaching sales of $800,000 in a 12-month period. Then, Martin's February 7, 2005 letter changed the offer and proposed the full $375,000 up front but with delayed royalty payments for the first 24 months or until such time as Martin reached a minimum of $800,000 in sales during a 12 month period. At least part of the reason for the change was the Halls' financial problems with prior business and personal debts. The up-front payment of

$200,000 was insufficient for the Halls, who planned to spend much of the up-front money to pay off existing debts and counted on the royalty stream to meet their personal expenses. Jim Gassen, Vice President of Martin reassured them, estimating that the $800,000 sales threshold would be met within the first six months.

On February 22, 2005, the parties reached an agreement, embodied within the "Asset Purchase Agreement", which reflects the terms of the February 7, 2005 letter. The agreement also incorporates the purchase of ISP's assets including inventory, manufacturing equipment, contracts, orders, and intellectual property. Despite the Halls' reliance on royalties, and advice of Mr. Lutz, there was no guarantee of minimum sales or royalties. The agreement does, however, contain a clause indicating that the written agreement would serve as the entire agreement between the parties, superseding any prior understandings, agreements, or representations.[2]

The day of acquisition, Martin issued a press release about the new products. It posted information about the new product-line on its website. Martin later formed a transition team to help integrate Orion products into its existing line. Leading the transition efforts was John Hall, who was designated "Product Champion." Under this title, he was paid to work with the Martin distribution network and educate staff about features and benefits of Orion products.

Some of Martin's development and marketing efforts slowed the distribution of the Orion products. Although ISP had produced brochures and guides for the Orion products, Martin decided

---

[2] The clause provides,
> Entire Agreement. This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof."

Asset Purchase Agreement; Def. Dep. Exh. 16 at 19.

to rework them using their own marketing team. Martin changed the color of the products to conform with the rest of the Martin line. Martin also changed elements of some of the Orion products, making them easier to manufacture with in-house components. In the spring of 2005, the Halls were told by Jerry Dillon, an SCP employee, that Martin distributors were not receiving the same profit margins on Orion products as the rest of the Martin line –creating a disincentive to sell Orion products. Martin explains this as the result of the price of ISP inventory and components for the Orion line.

On August 31, 2005, David Mueller, a product specialist with Martin, approached John Hall about help with the redesign of one of Martin's non-Orion products. According to John Hall, Mueller proposed that if Hall would help redesign one of Martin's primary cleaners, the XHD-QC-1, Martin would give Hall royalties from the sale of that cleaner and retire a parallel Orion product (the Orion 1000 heavy duty scraper). Hall understood that under this offer he would receive royalties anytime an XHD-QC-1 was sold. Defendant represents that the offer was only for royalties when the XHD-QC-1 was sold in conjunction with a more complete Orion system. It is undisputed that John Hall has not received royalties from sales of the XHD-QC-1 when the product has been sold independently from a more complete Orion system.

In late 2005, the Halls were in financial trouble. The $800,000 sales threshold had not been met and John Hall had not received royalty payments from the sale of the XHD-QC-1. John Hall asked for an advance on the $50,000 he was to be paid for consulting services in 2006. Martin agreed. In early 2006, John Hall approached Martin about additional money. Because Martin had

payed over $595,000 to the Halls in the past year,[3] Martin representatives asked John Hall why he needed the money. Hall provided them with a document showing over $116,000 in credit-card debt. According to John Hall's deposition, most of this debt was incurred prior to Martin's acquisition of ISP and the Orion products.

Martin's board decided to offer Plaintiff an advance of $200,000 in royalties and a full-time position within the company. The $200,000 advance was subject to six percent interest. The employee position paid $80,000 per year (with a deduction for the $50,000 consulting salary already paid John Hall for 2006). The employee position maintained John Hall's ability to earn royalties – at the same rate as he would have as a consultant – and additionally gave him a 3% commission on any Martin products he sold. A description of the position made clear that John Hall's primary duties remained focused on the development a customer base for Orion products. In exchange, John Hall gave up the right to royalty payments after 2016, a reduction of 9 years. Hall accepted the offer. However, in September, 2006 John Hall again approached Martin requesting additional compensation. He was not satisfied with the response from Martin and resigned his employment with the company.

In March 2007, when the 24 month limitation on royalties ended , Martin's Royalty Reports began reflecting a royalty credit to John Hall against the $200,000 advance. These reports include credit for royalties on the sale of Orion products as well as sales of Martin's XHD-QC-1 when it is sold as part of a more complete Orion system. Records reflect that as of October 30, 2008 the balance remaining on John Hall's royalty advance was $145,419. At that time Martin was on pace

---

[3]This amount includes the $375,000 purchase price, the $50,000 consulting fee, $68,810 for ISP and $101,204 in payments to John Hall, Billie Hall and their companies.

to sell over $900,000 worth of Martin products in 2008. Plaintiffs calculate that if they were given the royalties due to them solely on the sale of the XHD-QC-1, the advance would have been fully repaid and they are owed over $70,000. Sales of Orion products would generate additional royalties.

Despite the employment of John Hall to market products, the advance of royalty payments and the credit of royalties towards that advance, Plaintiffs contend that Martin never seriously intended to market Orion products or pay the Halls royalties. Rather, they contend that the deal to buy ISP and Orion was simply the "purchase of a book of business." As evidence they point to communications between Martin employees. An email received by Jim Gassed indicates that no marketing plan had been developed for the Orion line a few days before its acquisition. A later email written by Todd Swinderman states,

> I think the whole problem with Orion was the difference in viewpoints. I saw the product as a me too but the opportunity to buy market share made sense to me. Ed [Peterson, Martin Chariman] didn't grasp this and went off the deep end trying to promote a product that wasn't developed or that much different than what we already offer.

Nov. 15, 2006 Email from Swinderman to Hutter, Pls.' Exh. 23. Hand written notes by Ron Vick, Martin's CFO, list positive aspects of the deal to acquire ISP and Orion: 1) Squash competitor; 2) Buy market share; 3) Fill void in product; 4) Good manager/product. An email from Swinderman written on June 9, 2004 asks, "Knowing that ISP does between $500,000 and[]$1 million a year in product and service, what additional volume does SCP see in having ISP's customer list and transitioning [*sic*] [their] accounts to Martin produc[ts] and SCP service? Finally, Plaintiffs point to the fact that Martin developed and marketed only three Orion products, out of more than a dozen that had been sold by ISP.

In summation, Plaintiffs contend that Martin employees misrepresented their real intentions regarding the Orion products in order to easily and cheaply take over ISP's market share and eliminate the Halls and their products from competition. While they acknowledge that Martin has put forth some effort to develop Orion products and market them, Plaintiffs argue that this effort has been minimal and contrary to the clear understanding of the parties when they entered the Asset Purchase Agreement. Furthermore, Plaintiffs argue that the limited marketing and slow development of products, along with the restricted royalty agreements were part of a general scheme to place the Halls in a position of financial hardship and force John Hall into an employment agreement with limited compensation.

Defendant represents that the conduct of Martin's employees and the company itself is consistent with a legitimate and reasonable business strategy. Defendant does not deny that part of the motivation behind the ISP acquisition was the purchase of additional market share. They contend, however, that there was a value in the Orion products on which they intended to capitalize. Orion products were derived from Brelko brand products, which in turn were derived from Hosch brand products. Hosch is one of Martin's main competitors. Its belt cleaners, and their derivatives, differ from Martin belt cleaners in the angle of the blade. By incorporating Orion products into the Martin line, Martin had a product to offer consumers who preferred the Hosch-style blade angle. Defendant argues that development of the Orion product to meet this need took time, and marketing needed time to develop. In their opinion, John Hall was overly optimistic about immediate sales figures and impatient to receive royalties.

**Analysis**

Plaintiffs' complaint contains five counts. The Court dismissed Count II – Breach of Common Law Duty of Good Faith and Fair Dealing – because Illinois law does not recognize such a duty. *See* Order on Motion to Dismiss, September 12, 2007 ("Sept. 12th Order"). Plaintiffs have abandoned Count V – Tortious Interference with Contract and/or Prospective Business Relationships. The remaining claims for breach of contract, economic duress, and fraud or misrepresentation are discussed in turn below.

**I. Count I – Breach of Contract**

Under Illinois law, to prove a claim for breach of contract a plaintiff must establish four elements: "1) the existence of a valid, enforceable contract; 2) performance of the contract by the plaintiff; 3) a breach by the defendant; and 4) damages resulting from the breach." *Gore v. Indiana Ins. Co.*, 876 N.E.2d 156, 161 (Ill. App. Ct. 2007). As the Court noted in its Sept. 12th Order, there are two contracts at issue in this case: first, Martin's acquisition of the Halls' business through the Asset Purchase Agreement; second, the oral contract surrounding Martin's XHD-QC-1 belt cleaner. Although they are related, each of these contracts must be analyzed separately.

**A. Breach of the Asset Purchase Sales Agreement**

Plaintiffs contend that Defendant breached the Asset Purchase Sales by failing to develop and market their products in good faith. The Halls argue that by this failure, Martin breached its contractual duty to pay royalties to John Hall from the its sale of Orion products.

As Defendant rightly points out, Illinois recognizes neither an implied duty to use best efforts, nor an independent duty of good faith and fair dealing. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436 (7th Cir. 1992). Illinois courts, however, will use a covenant of good faith and fair

dealing as an interpretation aid to explicit provisions of a contract. *Id; see also, Voyles v. Sandia Mortgage Corp.* 751 N.E.2d 1126, 1131-32 (Ill. 2001). This use of good faith and fair dealing was explained in detail by the Seventh Circuit Court of Appeals in *Beraha.*

The plaintiff in *Beraha* was a doctor who had invented an improved biopsy needle. *Beraha* 956 F.2d at 1437. The doctor contracted with the defendant, Baxter Health Care Corp. ("Baxter") to develop and market this needle. *Id.* at 1438. In exchange for an exclusive license Baxter agreed to pay the doctor $50,000 up-front and future royalties on the sale of the product. *Id.* 1438-39. The contract contained no guaranteed minimum royalties and no best efforts clause. *Id.* Years later the improved biopsy needle had not been fully developed nor marketed. *Id.* Dissatisfied with the progress, and without royalties, the doctor filed suit. *Id.* Among other counts the plaintiff claimed that Baxter violated both express and implied obligations of good faith and fair dealings. *Id.*

The *Beraha* court began its analysis by distinguishing the covenant of good faith and fair dealing from an implied duty to use best efforts. A duty to use best efforts exists as an independent contractual duty and will only be implied in exceptional circumstances. *Id.* at 1441-43. The court explained "[e]specially . . . when an inventor grants a license to patented technology, the application of which is unknown, a commitment on the part of the licensee to devote best efforts to the development of the technology is a substantial commitment which should not automatically be inferred." *Id.* at 1442-43.

The covenant of good faith and fair dealing, on the other hand, serves only as a guide to the construction of explicit terms in a contract; it is implied in every contract. *Id.* at 1443. The *Beraha* court explained that the covenant is principally used when a contract vests significant discretion in one of the parties to a contract. *Id.* "[T]he implied covenant of good faith limits the controlling

party's discretion and the controlling party 'must exercise that discretion reasonably and with proper motive. . ." *Id.* quoting *Dayan v. McDonald's Corp.* 466 N.E.2d 958, 972 (Ill. 1984). It may not exercise its discretion arbitrarily, capriciously, or contrary to the parties' reasonable expectations. The development and sale of the biopsy needle were both essential to the payment of royalties and within the complete discretion of the company. The company chose neither to develop nor market the needle; consequently, plaintiff received no royalties. Whether this was a reasonable exercise of discretion or a bad faith attempt to avoid royalties payments was a factual question left for the jury.

As Plaintiffs, the Halls have the burden of providing concrete evidence of that Martin breached its duty to exercise its business discretion reasonably and with proper motive. They point to communications between Martin employees evincing a desire to eliminate them from competition as evidence in their favor. An email from Todd Swinderman, for example, clearly demonstrates that part of Martin's motivation in acquiring ISP and the Orion product license was to purchase market share. Hand-written notes and subsequent testimony provide additional support that this motive existed. The desire to acquire market share and even to "squash a competitor," however, are not necessarily indicative of improper motive. The purchase of a competitor's worthy product certainly has dual advantages: one is to avoid competition; the other is to profit directly from the sale of the product. The handwritten notes by Ron Vick bear this out; they outline many advantages, including squashing a competitor and buying market share but also filling a product void and acquiring a good product and manager. Because a motive to eliminate competition is not inconsistent with a motive to benefit from the market and sale of a new product, the communications between Martin employees are not evidence of the exercise of its discretion arbitrarily, capriciously, or contrary to the parties' reasonable expectations.

-13-

Plaintiffs must submit concrete evidence that Martin employees acted to hinder the development of Orion products so as to avoid its obligation to pay royalties to the Halls. The record, however, contains irrefutable evidence that Martin put forth substantial effort to market these products. Defendant conducted activities such as web seminars and international conference calls to inform their sales team of the new products. They formed a transition team to incorporate the new products into their existing line and made John Hall's principal responsibility that of building a sales base for Orion. In October Martin was on pace to sell over $900,00 worth of Orion products. Royalties from these sales have been credited against the $200,000 advance received by the Halls. Evidence that some activities slowed down the initial sale of John Hall's products, or that Defendant only chose to market certain products, is not itself evidence of bad faith. As the *Braha* court indicated the development of a new product is a substantial commitment. To second guess reasonable business decisions would be to turn the covenant of good faith and fair dealing into an implied duty to use best efforts – a result inconsistent with Illinois law.

The Court must bear in mind the covenant of good faith and fair dealing is an interpretation aid for the construction of a contract and not an independent duty. Here, the relevant provision of the contract is the agreement to pay royalties, dependant on the development and marketing of the Orion products. There is no dispute that Martin did pay royalties by giving an advance that is reduced as their products are sold. The record is clear that Martin put forth effort to develop and market the Orion products. Plaintiffs have not submitted evidence that Martin's effort falls below the exercise of reasonable business discretion consistent with the reasonable expectations of the parties. There is no concrete evidence Defendant exercised bad faith in these efforts. Plaintiffs have failed to offer evidence to support a necessary element of their claim. Insofar as it pertains to the

Asset Purchase Agreement, the Court **GRANTS** Defendant's motion for summary judgment on Plaintiffs' breach of contract claim.

### B. Breach of the Subsequent Oral Agreement to Pay Royalties on the XHD-QC-1.

Months after the execution of the Asset Purchase Agreement, the parties reached a separate oral agreement regarding royalties from one of Martin's best selling primary cleaners – the XHD-QC-1. The Halls contend that the under the terms of the agreement John was to receive six percent royalties on the sale of all XHD-QC-1 cleaners in exchange for his help re-designing the product. Defendant does not deny the existence of an oral agreement, only the terms understood by the Halls. Martin argues that the Halls were to receive royalties only when the XHD-QC-1 was sold in conjunction with Orion products.

Clearly, there is a material issue of fact regarding the terms of this subsequent oral agreement. Each party has submitted sworn evidence supporting their interpretation. Under the relevant standard, the Court cannot weigh the credibility of this evidence. Summary judgment on the breach of contract claim as it pertains to the subsequent oral agreement must be **DENIED**.

## II. Count III – Business Duress

Illinois courts recognize a cause of action for economic duress when, "one is induced by the wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will." *Alexander v. Standard Oil Co.* 423 N.E.2d 578, 582 (Ill. App. Ct. 1981); *accord*, *Inland Land Appreciation Fund L.P. v. County of Kane*, 800 N.E.2d 1232, 1238 (Ill. Ct. App. 2003). It is not enough that the plaintiff was pressured by personal difficulties or financial hardships, the pressures involved must be due to the wrongful acts or conduct of the other party "not merely on the necessities of the purported victim." *Golden v. McDermott*, 702 N.E.2d 581, 588 (Ill. Ct. App.

1998). "Duress does not exist merely where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances." *Higgins v. Brunswick Corp.* 395 N.E.2d 81, 84 (Ill. Ct. App. 1979).

In this case, Plaintiffs allege that there dire economic circumstances were directly related to wrongful conduct by the Defendant. Specifically, they complain that Martin engineered a scheme – to pay them a low up-front price for their business and then deny them future royalties – which caused them to lose their income stream. The facts revealed during discovery, however, show that the Halls were in a state of financial hardship before they entered any agreement with the Defendant. Because the Halls were responsible in large part for their own monetary troubles, Martin cannot be held liable for economic duress.

At the time the Halls sold ISP to Martin it had negative equity on the books for two straight years ($198,788.60 in 2002 and $186,049.50 in 2003). While John Hall stated his opinion that the business was doing fine and that he never missed a payment nor a meal, he also admitted that a lender had placed liens on some of ISP's property. He stated that most of the $350,000 paid to the Halls up front went to paying off ISP's business debts. The Halls were also having trouble making ends meet with their personal finances. While the Halls reported personal income of $132,000 from the operation of ISP in 2001, they earned only $48,000 in 2002 and $32,000 in 2003. When Martin inquired about the Halls' financial troubles, John Hall presented a document showing credit card debt of well over $100,000. He admitted this debt was incurred prior to Martin's acquisition of ISP.

Martin was aware of these troubles and some of its actions were in direct response. The Asset Purchase Agreement was structured to give the Halls enough up-front cash to alleviate their immediate business debts. When John Hall requested an entire year's salary in advance, the request

-16-

was honored. When these measures still did not solve the Halls' financial problems, they were given a loan to be paid off through the credit of future royalties, and John Hall was given a new position within the company at a higher salary. In exchange for all of this, the royalty agreement was restructured. It is not necessary to determine whether Martin acted to take advantage of the Halls' desperate financial situation, or as seems equally likely, acted to aid the Halls. It is undisputed that the Halls were in financial trouble before any of their deals with Martin and that this financial trouble was brought about by sources other than the Defendant. Under Illinois law the claim for economic duress fails because any hardship was brought about by a source other than the Defendant. The Court **GRANTS** Defendant's motion for summary judgment on Count III – Business Duress.

### III.  Count IV – Fraud and Misrepresentation

To recover on a claim of fraud, under Illinois law, a plaintiff has the burden of proving the following elements:

> 1) a false statement of material fact; 1) known or believed to be false by the party making it; 3) intent to induce the other party to act; 4) action by the other party in reliance on the truth of the statement; and 5) damage to the other party resulting from such reliance.

*People v. Murphy-Knight*, 618 N.E.2d 459, 463 (Ill. Ct. App. 1993) (quoting *Soules v. General Motors Corp.,* 402 N.E.2d 599 (Ill. 1980)). Generally statements of future events are considered opinions rather than facts and claims of fraud cannot be based on these statements even if a promise is made with no intention to carry through. *Murphy-Knight*, 618 N.E.2d at 463. An exception exists, however, when misrepresentation of future intent or conduct is part of a "scheme to defraud." *Bradley Real Estate Trust v. Dolan Assoc.'s Ltd.,* 640 N.E.2d 9, 12-13 (Ill. App. Ct. 1994) (citing *Steinberg v. Chicago Med. School*, 371 N.E.2d 634 (Ill. 1977)).

Plaintiffs have evidence of encouraging statements which raised their expectations for future sales and royalties of Orion products. Todd Swinderman told John Hall at their first meeting that Orion products would promptly be placed on the international market. Additionally, Swinderman estimated that sales would exceed $1million dollars per year. Likewise Jim Gassen tried to reassure the Halls they were entering a lucrative deal, with a good prospect of royalties. While these statements surely inspired confidence, they cannot serve as the basis for a claim of fraud and misrepresentation without evidence of a scheme to defraud. Here, there is no such evidence.

The Halls negotiated with Martin for over nine months before entering into the final Asset Purchase Agreement. During this time there was movement on both sides, and a changes of the contract terms. While the Halls did rely on Martin's attorneys to draft a final agreement, they were not unsophisticated. They sought out and received sound business advice which, for one reason or another, they chose to ignore. Although they wanted to structure a deal to give themselves the largest percentage of royalties possible, they ensured that they would receive a large enough up-front payment to take care of their most pressing business debts. The terms upon which the Halls' focus their complaints – the delayed royalty provision and reduced royalty period – were renegotiated in direct response to the Halls' needs. The Asset Purchase Agreement was freely negotiated and explicit about the terms of the agreement as well as the entirety of the agreement. Neither it nor isolated statements made during the course of negotiations can serve as evidence of the requisite "scheme of fraud."

Plaintiffs argue that if these statements themselves are not enough to show fraud, then Martin's nefarious intentions serve that purpose. Again, they point to communications between Martin employees demonstrating an intent and desire to remove ISP from competition as evidence

-18-

of bad faith. As the Court previously explained, without more, these statements are not evidence of bad faith. They are not inconsistent with a desire to profit from Orion products through marketing and sales. The Plaintiffs have failed to provide evidence of the requisite scheme of fraud; the Court **GRANTS** Defendants' motion for summary judgment on the claim of fraud and misrepresentation.[4]

## Conclusion

Plaintiffs allege that they were duped into selling their business well below its value, and that John Hall was forced to accept unfavorable employment terms because of difficult financial circumstances imposed by the Defendant. The facts on the record, however, dispel these allegations. The Halls did sell their business, but only after months of negotiation. The alleged unfavorable terms of the contract were proposed as a response to the Halls' own needs. Plaintiffs have provided neither evidence of bad faith nor a scheme of fraud. Although product sales have been slower than expected, there is no evidence that slow sales are the result of Defendant's actions. For these reasons, more fully elaborated above, the Plaintiffs claims pertaining to the Asset Purchase Agreement, the sale of ISP, and the sale of the Orion product license are resolved in favor of the Defendant. The Court **GRANTS in part** Defendant's motion for summary judgment (Doc. 86).

Plaintiffs do raise an issue of fact regarding a subsequent oral agreement involving royalties from the sale of Martin's XHD-QC-1 belt scraper. While Defendant contends that royalties are due only for the sale of the product in conjunction with an Orion system, Plaintiffs contend they are owed royalties on any sale of the scraper. This issue cannot be resolved at this stage of litigation.

---

[4] Plaintiffs argue that even if there is no evidence of fraud with the Asset Purchase Agreement, or statements pertaining to that agreement, that there is evidence of fraud related to royalties on the XHD-QC-1. On that matter as well, Plaintiffs have not offered evidence of a scheme. The grant of summary judgment covers the alleged fraud on both contracts.

As such the Court also **DENIES in part** the Defendant's motion for summary judgment (Doc. 86). The case will proceed on this limited issue.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

                                                ENTER:       February 10, 2009

                                                ROBERT C. CHAMBERS
                                                UNITED STATES DISTRICT JUDGE